IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 05-2262 WJ |
| | ) | |
| **C. L. BROWN**, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>RESPONSE TO MOTION TO SUPPRESS</u><br><u>FILED BY DEFENDANT ON APRIL 3, 2006</u>

Comes now, David C. Iglesias, United States Attorney, for the District of New Mexico and Rhonda P. Backinoff, Assistant United States Attorney, for said District and states in opposition to the above styled Motion as follows:

## <u>FACTS</u>

On September 27, 2005, at approximately 11:00 p.m., C. L. Brown, Jr. drove into the Gallup Port of Entry driving a white 2000 Freightliner tractor trailer.  Motor Transport Division (MTD) Inspector Ken Homer, who was on duty at the time, made contact with Brown.  Once he obtained Brown's log book, he noticed that the driver was off duty on September 25, 2005, at Santa Rosa, New Mexico and was back on duty on September 26, 2005, in San Simon, Arizona.  The driver failed to go on duty in Santa Rosa and didn't have a co-driver.

Inspector Homer then contacted MTD Officer David Macatee who was advised of the situation.  Brown was then instructed to drive the truck around to bay number two for a level 2 inspection, which would consist of all company and driver information, and a

safety inspection of the truck, trailer and cargo securement.  The driver  appeared to understand the process.

Officer Macatee began by obtaining all paperwork for the truck, trailer, company and driver.  The driver was instructed to turn on all lights and wipers, to sound both horns, and to inspect the windshield for cracks.  A "walk around" inspection was then conducted checking all lights, tires, lug nuts, and listening for audible air leaks; also, checking for cracks on the wheels, frame, and body mounts.  As Officer Macatee was conducting the inspection, he would inform Officer Murphy of any violations as he completed filling out the inspection form.

Upon completion of the "walk around" inspection, the driver was asked to open the rear door of the trailer for the cargo securement check.  Officer Macatee then crawled to the front of the trailer to inspect two very large metal screen devices.  The objects appeared to be secured with only minimal shifting occurring with the trailer.

While looking to the front of the trailer, Officer Macatee noticed what appeared to be fresh caulking.  Upon a closer inspection, he could see that the screws had fresh markings consistent with tampering.  He noticed some screws were black and somewhat rust colored of the Torx head design. But inside the torx head portion areas, shiny fresh metal could be observed.  There were numerous large flange aluminum rivets that appeared to have been recently installed and these rivets are not consistent with being used for commercial vehicle trailer use.  These rivets normally do not have a length long enough to secure wood of this thickness to a metal frame.  Phillips type wood screws were also used in the retention of the plywood.

Officer Murphy and Inspector Homer then began checking the length of the trailer both inside and outside, using a digital laser measuring device.  The measurement was approximately three feet shorter on the inside measurement.  Officer Macatee then climbed into the trailer and crawled to the front and removed several screws to pull the plywood wall out to look behind it, and he discovered that as he attempted to remove the Torx headed screws, that many appeared to be stripped and possibly were just placed there because they didn't appear to be actually securing anything.  He then began to remove the phillips screws, these were somewhat tough to remove.  Office Macatee was able to pull out the upper right hand corner just enough to look inside.  He observed a separate cargo area which concealed numerous square bundles, silver in color.  At this time, he instructed Officer Murphy to place the driver under investigative detention for further confirmation of the articles located behind the wall of the false compartment.  One piece of plywood was removed from the upper left side.  Numerous large bundles were observed inside the hidden compartment.  Some bundles were wrapped in a silver wrapping while others were wrapped in a wood grain looking wrapping.  Two large duffel bags were seen over the left side of the opening. To the right of the opening the bundles were stacked closer to the roof of the trailer.  Speaker wire was also observed connecting to a silver colored cylindrical devise.

New Mexico State Police was requested to the scene and Agents Damyan Brown and Glen Kelsey responded.  Upon their arrival, the bundles were removed from the false compartment and it was learned that the bundles contained marijuana.  The marijuana was weighed at approximately 1,650 lbs. gross weight.  Agent Kelsey later field tested the marijuana and it field tested positive for that substance.

- 3 -

Agent Kelsey and Sgt. Scott Armstrong attempted to question Brown after he was read his Miranda Warnings, but Brown stated he wished to speak with an attorney before answering questions.  He did, however, ask how he could help himself out with the charges and Agent Kelsey explained to him his options.

According to Task Force Officer Anna Griego after arrest, the defendant stated he wanted to help himself but did not admit that he knew about the marijuana in the secret compartment.

A.     <u>COMMERCIAL TRUCKING IS A HIGHLY REGULATED INDUSTRY, SUCH THAT INSPECTORS AT PERMANENT PORTS OF ENTRY MAY INSPECT COMMERCIAL RIGS WITHOUT ANY INDIVIDUALIZED SUSPICION THAT THE DRIVER IS ENGAGED IN CRIMINAL CONDUCT</u>

The Supreme Court has held that warrantless searches of pervasively regulated businesses will be upheld if reasonable. *Burger v. United States*, 482 U.S. 691, 716 (1987).  In *Burger*, the Supreme Court upheld an administrative search of a junkyard by *regular* police officers (not administrative inspection officers such as the officers at the Gallup Port of Entry)[1], and dismissed the defense argument that the search was a ruse for police to look for stolen vehicles. *Id.*  It did not matter that the officers were non-administrative officers. *Id.*  Also in *Burger*, the Supreme Court held that a warrantless search of a pervasively regulated industry is reasonable when (1) there is a substantial state interest behind the regulatory scheme, (2) the search is necessary to further that scheme; and (3) the statutes authorizing such a search is an adequate substitute for the

---

[1] Motor Transportation Inspectors have as their primary duty the inspection of commercial motor transport vehicles for safety and compliance with all relevant regulations, but they are also police officers as defined by New Mexico law. N. M. Stat. Ann. § 65-5-7 (Michie 1978) (2004).

warrant requirement in providing notice to the business owners and limiting the discretion of inspectors. *Id.* at 702.  *Burger* also stands for the proposition that so long as a regulatory search is properly administrative, it is not rendered illegal by the fact that the inspecting officer has the power to arrest an individual for violations other than those created by the scheme. *United States v. Johnson*, 408 F.3d 1313, 1320 (10th Cir. 2005), citing *Burger* at 712.

The Tenth Circuit spoke to the regulatory scheme of the trucking industry in *United States v. Vasquez-Castillo*, 258 F.3d 1207 (10th Cir. 2001).  The relevant New Mexico statutes and factors related to the New Mexico Ports of Entry were addressed in *Vasquez-Castillo*, where the Court held that an inspector's presence inside the trailer of the "driver's" truck was within the scope of the administrative inspection.  Moreover, the Court held that all three prongs of the *Burger* analysis were met, stating that: (1) " [w]e find that the safety inspections of commercial carriers satisfy the first prong of the *Burger* test" and "[t]he state clearly has a substantial interest in regulating [commercial carriers] to protect public safety on the highways", *Vasquez-Castillo,* 258 F.3d at 1211, *citing V-1 Oil Co. v. Means,* 94 F.3d 1420, 1426 (10th Cir. 1996), *United States v. Fort*, 248 F.3d 475, 480 (5th Cir. 2001), and *United States v. Dominguez-Prieto*, 923 F.2d 464, 468 (6th Cir. 1991); (2) "[w]e find that the safety inspections presently under consideration satisfy the second prong of the *Burger* test", *Id.*; and (3) "[w]e further find that this regulatory scheme satisfies the third prong of the *Burger* test." *Id.*, at 1212.  The regulatory scheme addressed in *Vasquez-Castillo* is indistinguishable from the case at bar.  Also, and importantly, *Vasquez-Castillo* held that the factors justifying the warrantless inspections of commercial carriers are "more compelling than those present in *Burger* because

commercial carriers, unlike automobile junk yards considered in *Burger*," "pass quickly through states and out of the jurisdiction of the enforcement agencies," agreeing with the Fifth and Sixth Circuits, and *citing Dominguez-Prieto*, 923 F.2d at 469, and *Fort,* 248 F.3d at 481.

A more thorough review of *Vasquez-Castillo* reveals that the challenge brought by Mr. Brown is not new to the Courts of this and other districts. *See Id.* at 1210, *stating* "[w]e have previously held that commercial trucking is an industry closely regulated by both federal and state governments" *citing United States v. Burch*, 153 F.3d 1140, 1141-43 (10th Cir. 1998); *V-1 Oil Co. v. Means*, 94 F.3d 1420, 1426 (10th Cir. 1996). *Vasquez-Castillo* also cited other Circuit Court opinions addressing the issue. *Id., citing United States v. Fort*, 248 F.3d 475, 480 (5th Cir. 2001); *United States v. Dominguez-Prieto*, 923 F.2d 464, 468 (6th Cir. 1991). *See also United States v. V-1 Oil Co.,* 63 F.3d 909, 911 (9th Cir. 1995) (warrantless search of liquified propane gas retailer valid because sale and transport of hazardous materials pervasively regulated industry). Inspectors can even enter the cab of the vehicle without a warrant, an area that is arguably much more private than the contents of a truck driver's commercial load. *United States v. Mendoza-Gonzales,* 363 F.3d 788 (8th Cir. 2004) (Truck driver's Fourth Amendment rights not violated by Iowa Department of Transportation officer's discovery of compartment under *truck driver's sleeper mattress*, because discovery made during a valid regulatory inspection) (emphasis added).

The defendant, argues that this was a warrantless search conducted without probable cause. The government states this was an administrative search. That probable cause to believe the trailer contained contraband existed and that the location

- 6 -

of a secret compartment is an important concern for the safe passage of commercial

motor vehicles.

The issue of whether this was a warrantless search was also resolved by

*Vasquez-Castillo*, 258 F.3d at 1211 ("[w]e find that the regulatory scheme governing

commercial carriers provides adequate notice to owners and operators of commercial

carriers that their property will be subject to periodic inspections and adequately limits

the discretion of inspectors in place and scope.  New Mexico law requires all commercial

motor vehicle carriers to stop at every port of entry . . . for manifesting and clearance

stickers."), *citing* N.M. Stat. Ann. § 65-5-1(A) (Michie 1978)(2004).  Moreover,

"Defendant could not help but be aware that his property was subject to periodic

inspections undertaken for specific purposes, including inspection of blocking and

bracing" which allows for inspections that include the interior of the trailer." *Vasquez-

Castillo*, 258 F.3d at 1212; 49 C.F.R. § 393.104 (2004) (relating to protection against

shifting and falling of cargo).

New Mexico has detailed requirements which apply to commercial motor carrier

vehicles entering or leaving the state.  N. M. Stat. Ann. § 65-5-1 et. seq. (Michie 1978)

(2004).[2]  All such vehicles are required to stop at every port of entry for "manifesting and

clearance stickers". § 65-5-1(A).  Operators are required, upon request, to produce a

manifest which must contain 14 specified items of information. § 65-5-1(B)(1)-(14).

Inspectors are permitted to verify the accuracy of such information and to "ascertain

whether the vehicle is in safe and roadworthy condition, properly equipped with all lights,

---

[2] The vehicle involved in this case was a commercial motor carrier vehicle under New Mexico law.  N.M. Stat. Ann. § 65-1-2©
(Michie 1978) (2004 ).

- 7 -

brakes and other appliances required by any statute of [New Mexico], in such condition as to be safe for operation upon the public highways of [New Mexico]". § 65-5-1(C). Inspectors are permitted to inspect the vehicle and its contents "to determine whether all laws and all rules and regulations of [New Mexico] with respect to public safety, health, welfare and comfort have been fully complied with." § 65-5-1(F).

Likewise, the federal government has established a detailed set of regulations applicable to commercial vehicles moving in interstate commerce. 49 C.F.R. § 392.1 et. seq. (2004). States are encouraged to enforce their laws and the federal regulations simultaneously by filing a written acceptance of the applicable C.F.R. provisions with the Federal Highway Administration. 49 C.F.R. § 388.1 (1998). New Mexico has done so. N.M. Stat. Ann. § 65-1-9 (Michie 1978) (2004). The breadth and detail of federal and state statutory and regulatory requirements for commercial motor carriers compel the conclusion that the trucking industry is pervasively regulated, as held in *Vasquez-Castillo*. The court in *Vasquez-Castillo*, in a footnote, chose not to address whether an inspector can enter a trailer to inspect cargo because it found that an inspector must inspect the interior of a trailer to check the blocking and bracing. *Vasquez-Castillo* at 1212, n. 3. Nevertheless, the Court does indicate quite strongly that had it dealt with the issue, it would have found that an inspector does have such authority. *Id.* at 1211, *citing* favorably and with emphasis N.M. Stat. Ann. § 65-5-1(F) ("To determine whether the vehicle is safe, those in charge of the port of entry are permitted to "inspect the vehicle *and its contents* to determine whether all laws and all rules and regulations of the departments of [New Mexico] with respect to public safety, health, welfare and comfort have been fully complied with."") (emphasis in original).

Under New Mexico law, inspectors of commercial carriers are expected to enter the trailer as part of their safety inspections. *See* N.M. Stat. Ann. § 65-5-1(D).  (The person in charge of the port of entry may satisfy himself as to the contents of the cargo), and § 65-5-1(E).   (The person in charge of the port of entry may inspect the contents of the vehicle to determine whether all taxes on gasoline and motor fuel and excise taxes on alcoholic liquors and all taxes on any other property have been fully paid), and § 65-5-1(F).  (The person in charge of the port of entry may inspect the vehicle and its contents to determine whether all laws and all rules and regulations of the departments of this state with respect to public safety, health, welfare and comfort have been fully complied with.)

A cargo check of a commercial truck at a permanent inspection station such as the one at the Gallup Port of Entry "falls within the exception to the written warrant requirement for administrative inspections of pervasively regulated industries."  *See Burger* at 693.  Once the officer entered the trailer to check for load securement and observes irregularities that could affect the structural safety of the trailer, the regulatory aspect became an investigation based on probable cause.  The investigation continued with the confirmation a false compartment and culminated in the interdiction of a significant illegal load of drugs.

The defendant's motion cannot stand and should be denied.

B.    OFFICER MACATEE ENTERED THE TRAILER PURSUANT TO VALID AUTHORITY.

Since *Vasquez-Castillo* clearly held that a Port of Entry Inspector's presence inside the trailer belonging to a truck driver was within the scope of an administrative

search, it need not be argued here that any Motor transport officer needed any level of probable cause to enter the trailer. *See Vasquez-Castillo, supra.* Once Officer Macatee identified a possible false compartment, he had probable cause to detain the defendant, Brown and conduct a further search.

The search and seizure were "reasonable" and did not offend the Fourth Amendment. *United States v. Browning*, 252 F.3d 1153, 1157 (10th Cir. 2001); *United States v. Gama-Bastidas*, 142 F.3d 1233, 1237 (10th Cir. 1998).  The defendant had a much lesser expectation of privacy in the tractor and the trailer than would a non-commercial driver.

The defendant's motion to suppress the 748 kilograms of marijuana found in the trailer he was hauling should be denied.


## CONCLUSION

Based on the foregoing and in light of the circumstances of this case, the government respectfully asks the Court to summarily deny the defendant's motion to suppress without a hearing on the basis that the motion fails to state a legal basis for suppressing 1,650 pounds of marijuana.  The government asks the Court to deny defendant's motion to suppress as the defendant cannot establish that as a commercial truck driver he had a reasonable expectation of privacy in the contents of the trailer he was hauling.

The defendant's motion must be denied.

Respectfully submitted,

David C. Iglesias

United States Attorney

***Electronically filed 4/05/2006***

RHONDA P. BACKINOFF
Assistant United States Attorney
P. O. Box 607
Albuquerque, NM  87103-0607
(505) 346-7274

<u>CERTIFICATE OF SERVICE</u>

I CERTIFY that a true copy
of the foregoing pleading was
served by mail/fax on counsel of
record this 5th day of April, 2006.


/s/_____
Rhonda P. Backinoff
Assistant U.S. Attorney

N:\MBorunda\RPB\Brown, C.L\resp mot to SUPRESS.wpd